RECEIVED
IN LAKE CHARLES, LA

AUG 2 2 2005
PAM
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **JOSEPH WATTS** | : | **DOCKET NO. 2:04 CV 2491** |
| **VS.** | : | **JUDGE MINALDI** |
| **PRUDENTIAL INSURANCE COMPANY OF AMERICA** | : | **MAGISTRATE JUDGE WILSON** |

## MEMORANDUM RULING

Presently before the court is a Motion for Summary Judgment filed by the defendant, Prudential Insurance Company of America ("Prudential") [doc. 12] and a Motion for Summary Judgment filed by the plaintiff, Joseph Watts [doc. 14].

Summary Judgment Standard

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c) The movant bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, and answers to interrogatories, admissions on file and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials

in the pleadings but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322-23, 106 S.Ct. at 2552-53; *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514-15; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

Law and Analysis

Jurisdiction

Watts's claim to recover long term disability payments "relates to an employee benefit plan" thus falling within the scope of ERISA's preemption provision. As an employee, Watts is a "participant" under the rubric of ERISA, 29 U.S.C. §§ 1002(7). He is able to assert his claim pursuant to ERISA's civil enforcement provision, 29 U.S.C. §§ 1132(a)(1)(B). Watts claims a violation of ERISA when he alleges a denial of benefits. A federal question exists as to his claim and jurisdiction properly lies with this court. *Hubbard v. Blue Cross & Blue Shield Ass'n*, 42 F.3d 942, 945 (5th Cir (Tx) Jan 12, 1995).

Standard of Review for Plan decisions

A denial of ERISA benefits by a plan administrator is reviewed by the courts *de novo* unless the plan gives the plan administrator "discretionary authority to determine the eligibility for benefits or to construe the terms of the plan." *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1305 (5th Cir.1994)(*quoting Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989)). *Southern Farm Bureau Life Insurance Co. v. Moore*, 993 F.2d 98 (1993), states that because ERISA does not dictate the appropriate standard of review for evaluating benefit determinations of plan administrators, courts must first look to the plan terms to determine if the plan administrator has the discretionary authority to interpret the plan terms. 993 F.2d at 100.

The abuse of discretion standard is the appropriate standard of review for challenges to a plan administrator's interpretation of the plan terms when that plan grants the administrator the authority to make a final and conclusive determination of the claim. *Duhon,* 15 F.3d at 1305 *(citing Bruch,* 489 U.S. at 115, 109 S.Ct. at 956). In applying the abuse of discretion standard, the court must analyze whether the plan administrator acted arbitrarily or capriciously. *Bellaire Gen. Hosp. v. Blue Cross Blue Shield,* 97 F.3d 822, 829 (5th Cir.1996).

Under *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), when an administrator has discretionary authority with respect to the decision at issue, the standard of review should be one of abuse of discretion. The court reasoned that the issues are often complicated by the relative sophistication of the parties. An employer may have an incentive to choose a less expensive benefit plan for his employees, even though that plan grants a self-interested administrator discretion to resolve claims. When an employee files such a claim, the administrator has a financial incentive to deny the claim and often can find a reason to do so. The employee, on the other hand, is often not a sophisticated negotiator and therefore may not best present his case to the administrator.

Since *Bruch,* the Fifth Circuit struggled with the appropriate standard of review for determinations by a self-interested administrator with discretionary authority using a sliding scale standard. *See, Salley v. E.I. DuPont De Nemours & Co.* 966 F.2d 1011 (5th Cir.1992) (holding that a conflict of interest required the court to more closely examine the denial of health care benefits under the plan); *Duhon v. Texaco, Inc.,* 15 F.3d 1302, 1306 (5th Cir.1994) (holding that court must "weigh this possible conflict as a factor in our determination of whether the plan administrator abused his discretion, instead of ... altering the applicable standard of review"); *Sweatman v. Commercial Union Insurance Co.,* 39 F.3d 594, 599 (1994) (holding that conflict does not change the standard of review, but should be weighed in determining whether administrator abused his discretion); *Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 638-42 (5th Cir.1992)("We note that the arbitrary and capricious standard may be a range, not a point. There may be in effect a sliding scale

of judicial review of trustees' decisions--more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is...."). Under this "sliding scale" standard, the court always applies the abuse of discretion standard, but gives less deference to the administrator in proportion to the administrator's apparent conflict.

Prudential is both the insurer and the claims administrator of the policyholder's long term disability plans. Because of this, the Court must apply a "sliding scale standard" to the abuse of discretion test and give Prudential's decision a lesser degree of deference than would be given the decision of an administrator who does not have a conflict of interest.

### Process for Reviewing Administrator's Denial of Benefits

An ERISA claim administrator's determination is not an abuse of discretion when it is supported by substantial evidence. *Meditrust Fin. Sers. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999). When reviewing an administrator's determinations, the court is limited to the evidence in the administrative record at the time the determination was made. *Gooden v. Provident Life & Accident Ins.*, 250 F.3d 329, 333 (5th Cir. 2001).

The plaintiff, Joseph Watts ("Watts"), has filed a complaint seeking to recover disability insurance proceeds from the defendant, Prudential.

Watts was a participant in the Coushatta Tribe of Louisiana d/b/a Grand Casino Coushatta's Employee Welfare Benefit Plan ("the Plan"), which was underwritten and issued by Prudential. The Plan provides for Short Term Disability ("STD") and Long Term Disability ("LTD") benefits payable to the participant if the participant becomes disabled while eligible under the Plan. The Plan, established and maintained by the Coushatta Tribe of Louisiana d/b/a Grand Casino Coushatta, provides Prudential with the sole discretion to interpret the terms of the Plan documents and to make factual findings and to determine the eligibility of a Plan participant.

4

Facts[1]

Prior to claiming disability, the plaintiff was employed as a Pit Supervisor. This position was classified as light duty, and the plaintiff's job responsibilities included: supervising the operation of table games, frequent walking and standing.[2]

The plaintiff left work on July 11, 2002.[3] His application for STD/LTD benefits under the policy was filed with Prudential on or about July 19, 2002.[4] The plaintiff received STD benefits through approximately January 7, 2003.[5] His LTD In-Benefit date was January 7, 2003.[6] Initially Prudential terminated Watts's LTD benefits effective May 1, 2003. Subsequently, after much investigation and further testing, Prudential overturned its decision to terminate benefits and extended benefits for a closed period through January 6, 2004. Benefits were then terminated effective January 7, 2004, the date the catastrophic limitation became effective. Prudential determined that Watts did not fulfill the requirements of catastrophic disability and would no longer qualify for LTD under the policy.[7]

---

[1] There are more facts associated with the plaintiff's STD and LTD benefits. This ruling summarizes only those facts directly relating to the determination of catastrophic disability.

[2] See plaintiff's job description, Bates labeled PRU-Watts 1030-1031; 0749-0750.

[3] Pru-Watts 1028.

[4] Pru-Watts 1028-1036.

[5] Pru-Watts 1091-1093.

[6] Pru-Watts 1028-1036.

[7] Pru-Watts 1125-1127; 0032.

After receipt of Prudential's January 7, 2004 letter, Watts filed an appeal on March 2, 2004.[8] On June 8, 2004, plaintiff's counsel provided Prudential with an updated medical assessment from Dr. Campbell[9], the plaintiff's treating physician[10]. On June 28, 2004, plaintiff submitted all of the plaintiff's medical records from Dr. Campbell from November 2003 through the present.[11]

Prudential arranged for Dr. M. Riad Haj Murad, a neurologist, to perform an Independent Medical Examination (IME) of Watts on August 26, 2004.[12] Dr. Murad noted that the plaintiff underwent extensive testing and was diagnosed by his treating physician as having Chronic Inflammatory Polyneuropathy Disease (CIPD). Watts complained of cognitive deficits, difficulty concentrating and with memory function, loss of feeling below the waist and upper and lower extremity weakness. Watts also indicated to Dr. Murad that he required assistance getting in and out of the bathtub, as well as assistance in getting dressed. Additionally, the plaintiff complained that he could not get up or walk without assistance.[13]

Dr. Murad opined that if the plaintiff suffered from CIPD, he would meet the criteria for disability. However, to verify the plaintiff's symptoms, Mr. Murad wanted to perform nerve studies consisting of an EMG/NCV to correlate the plaintiff's subjective complaints with Dr. Murad's objective findings. Dr. Murad also felt that extensive testing would be required to measure the

---

[8] Pru-Watts 0718.

[9] Dr. Andrew William Campbell, M.D., is a toxicologist.

[10] The plaintiff was also treated by Dr. High.

[11] Pru-Watts 0337.

[12] Pru-Watts 0318-0321.

[13] See *id.*

severity of the plaintiff's alleged cognitive symptoms.[14]

Dr. Murad noted that during his examination, the plaintiff was able to carry on a conversation that demonstrated his mental functioning to be within normal limits, or possibly just below normal limits.[15]

Prior to issuing its LTD benefits termination letter on January 7, 2004, Prudential was in possession of the following medical information on Watts:

1) May 16, 2002: Dr. Cynthia Sloan, Neurologist. Abnormal brain stem auditory evoked testing indicative of polyneuropathy.[16]
2) October 10, 2002: Abnormal NCV, EMG and SPECT.[17]
3) November 8, 2002: Brain Perfusion Study by Nuclear Imaging of Texas indicated obvious lateral reductions in blood flow in the brain, worse on right than left.[18]
4) December 10, 2002: Neurological Consult from Dr. William High, finding peripheral neuropathy, cognitive decline, deterioration in the motor conduction in all nerves in the lower extremities and the ulnar nerves bilaterally in the upper extremities, deterioration in sensory function in the lower extremities since May, 2002. Conclusion: Patient has a progressive demyelinating polyneuropathy and he is a candidate for gammaglobulin treatment.[19]
5) January 21, 2003: Neurological office notes from Dr. William High. Progressive neuropathy, with developing new symptoms of lateral femerocutaneous nerve involvement bilaterally; Watts is a candidate for gammaglobulin therapy.[20]
6) February 13, 2003: Letter from Attorney Jill Kuswa enclosing records from Dr. Cynthia Sloan, Neurologist, noting numerous medical and neurological problems.[21]
7) March 26, 2003: Letter to Watts from UniCare, medical manager for Watts's health

---

[14] See *id.*

[15] See *id.*

[16] Pru-Watts 0826-0827; 0830-0832.

[17] Pru-Watts 0838-0841; 0991-0993.

[18] Pru-Watts 0642.

[19] Pru-Watts 0597.

[20] Pru-Watts 0877.

[21] Pru-Watts 989-992.

insurance provider, addressing the CDIP diagnosis.[22]
8) April 1, 2003: Report from DR. Andrew Campbell, treating immunologist. Responding to UniCare's concerns about CDIP and the use of IVIG (Intravenous Immune Gammaglobulin) as proper treatment, along with supporting medical literature.[23]
9) April, 2003: UniCare accepted the CDIP diagnosis and IVIG infusion therapy began. Watts determined and/or noted to need assistance in the following activities of daily living: bathing and feeding.
10) May 27, 2004 letter from Dr. Campbell to UniCare updating Watts's medical condition: Chronic deteriorating condition, requirements for Oxygen Therapy 8-25 hours per day, need for assistance from others to complete his activities of daily living, severe muscular weakness, intermittent loss of consciousness secondary to hypoxia; need for motorized chair.[24]

Prudential conducted an activity surveillance of the plaintiff on August 6, 2004. Although Watts claimed that he could not walk without assistance, he was observed walking unaided to his vehicle after his IME. Although his wife accompanied him to the IME, she did not assist him while walking back to their truck. The plaintiff was able to climb up into the passenger seat without assistance, reached out and closed the door, and then buckled his seatbelt without assistance.[25]

On October 18, 2004, Dr. Murad issued an addendum to his August 26, 2004 IME. Although Dr. Murad acknowledged that the plaintiff had experienced some decline in cognitive function, he did not observe significant deterioration in mental function.[26] Watts states that notably absent from Dr. Murad's addendum was any mention of Prudential's inaction on his request for further testing on Watts. In his addendum dated October 18, 2004, and after Prudential had requested an opinion

---

[22] Pru-Watts 0944-945.

[23] Pru-Watts 0935-0939.

[24] Pru-Watts 1168.

[25] See the Surveillance CD-ROM enclosed with the MSJ, Exhibit P.

[26] Pru-Watts 0320.

on catastrophic disability, Dr. Murad stated:

> Based on the information from the patient and the history obtained, although I have not done EMG, the diagnosis of CDIP does fit the catastrophic disability.[27]

Dr. Murad noted that Watts did have weakness in both lower and upper extremities, was not able to do things on his own, needed his wife's assistance to dress himself, had difficulty getting in and out of a bathtub, and needed assistance to move around the house. Watts also described cognitive impairment, the extent of which Dr. Murad was unsure because of the absence of a neuropyche test. Dr. Murad concluded by saying:

> Overall, if the patient was diagnosed as having CIPD, he is not able to work or do any activity and needs to have complete support as well as chronic treatment.[28]

Based upon the surveillance, Dr. Murad's examination, and Dr. Rutchik's[29] prior file review, Prudential determined that the medical documentation did not support a cognitive dysfunction or medical condition that met the policy definition of a catastrophic disability. Prudential determined that the medical documentation did not support impairment, cognitive or physical, that would preclude the plaintiff from performing any work or activities, or that would require constant supervision of the plaintiff.[30]

Prudential noted that the plaintiff's counsel specifically requested that the IME of the plaintiff occur on a date that his wife was not working so that she could accompany him to the appointment.

---

[27] Exhibit C to Plaintiff's MSJ.

[28] See *id.*

[29] Dr. Jonathan Rutchik was asked by Prudential to review the file during the plaintiff's first appeal of LTD benefits. Dr. Rutchik is Board Certified in Neurology, as well as Occupational and Environmental Medicine.

[30] Pru-Watts 1144-1148.

9

There was never an allegation that the plaintiff was supervised or assisted while his wife was at work, outside the home.[31]

Prudential notified the plaintiff in a letter dated November 12, 2004 that its decision to terminate LTD benefits effective January 7, 2004 would be upheld. The plaintiff was also notified of an overpayment totaling $2,937.85 and although Prudential requested reimbursement for this amount, it remains outstanding.[32]

Law and Analysis

The Policy provides for payment of LTD benefits to qualified individuals if the policy holder meets all contractual obligations, including:

- You are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** and **injury;**
- you have 20% or more loss in weekly earnings due to the same sickness or injury.

After 12 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you:

- are unable to perform, without **substantial assistance**, at least two **activities of daily living;** or
- have a severe **cognitive impairment**, which requires **substantial supervision** to protect you from threats to health and safety.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

(Emphasis in the original).

**Substantial Assistance** means:

---

[31] See *id.*

[32] See *id.*

10

- the physical assistance of another person without which you would not be able to perform an activity of daily living; or
- the constant presence of another person within arm's reach which is necessary to prevent, by physical intervention, injury to you while you are performing an activity of daily living.

**Activities of daily living** means:

- Bathing - washing oneself by sponge bath, or in either a tub or shower, including task of getting into or out of the tub or shower;
- Continence - the ability to maintain control of bowel or bladder function; or, when unable to maintain control of bowel and bladder function, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag);
- Dressing- putting on and taking off all items of clothing and any necessary brace, fasteners, or artificial limbs;
- Eating - feeding oneself by getting food into the body through a receptacle (such as a plate, cup, or table) or by feeding tube or intravenously;
- Toileting - getting to and from the toilet, getting off and on the toilet, and performing associated personal hygiene;
- Transferring - sufficient mobility to move into or out of a bed, chair or wheelchair or to move from place to place, either by walking, using a wheelchair, or by other means.

**Cognitive Impairment** means a loss or deterioration in intellectual capacity that is:

- comparable to and includes Alzheimer's Disease and similar forms of irreversible dementia;
- measured by clinical evidence and standardized tests that reliably measure impairment in the individual's short-term or long-term memory, orientation as tp person, place or time; and deductive or abstract reasoning.

**Substantial Supervision** means continual oversight that may include cuing by verbal prompting, gestures, or other demonstrations by another person, and which is necessary to protect you from threats to your health or safety.[33]

In order to recover LTD benefits, the policyholder must also continuously meet the definition

of Total Disability through the 180 day elimination period. "Elimination period means a period of

---

[33] See Exhibit A to MSJ, at Pru-Watts 1060-1062; 0190-0192; 0243-0245; 0137-0139; and 0073-0075 (emphasis in the original).

continuous disability which must be satisfied before you are eligible to receive benefits from Prudential."[34]

The only issue before the court at this time is whether Prudential's decision to terminate LTD based upon a lack of physical and/or cognitive impairment was arbitrary and capricious. Although Prudential determined that the plaintiff had some cognitive and physical impairments, they found that these impairments did not rise to the level of disability required by the policy. Prudential found that there was no evidence in the record that Watts required substantial assistance with two or more activities of daily living or that he required substantial supervision due to cognitive deficits.

Prudential relied upon all the medical records in the administrative record, noting that Dr. Kowalski has specifically found that the plaintiff's mental status was normal and that his physical examinations and testing were within normal limits. Dr. Rutchik noted that there was no explanation in the record of how the plaintiff's subjective complaints limited him from working, and further, that a diagnosis of CIPD was not clearly supported by any evidence.

The plaintiff argues that Prudential based its denial of benefits on its interpretation of "substantial assistance", as requiring another person to be within arm's reach when performing an activity of daily living. Watts argues that Prudential, in interpreting the term "substantial assistance," completely ignores the fact that the conjunction "or" is used in the definition, and that substantial assistance is also defined as "the physical assistance of another person without which you would not be able to perform an activity of daily living." In April 2003, when in-home IVIG treatment began, Watts was noted to need assistance with bathing and feeding.[35] Watts argues that Prudential has no

---

[34] See *id.*

[35] Pru-Watts 0566.

12

evidence to refute his assertion that he requires assistance getting in and out of the bathtub as well as assistance in getting dressed.

Watts argues that it is clear from the record that all of the physicians who actually saw and evaluated the plaintiff, including the IME neurologist, considered his disability to be of a catastrophic nature. Watts further argues that Prudential's interpretation is legally incorrect because, under their interpretation virtually no person could ever satisfy the definition of catastrophic disability. Watts takes the position that the Policy language is ambiguous and susceptible to more than one reasonable interpretation as evidenced by Prudential's own words when it interpreted "substantial assistance" to mean exclusively that another person needs to be within's arm's reach when performing an activity of daily living.

Watts argues that Prudential ignored evidence from Watts's treating physicians and Dr. Murad that stated that his physical disability was of a catastrophic nature. Watts takes a large volume of medications, each of which has varying side effects.[36] In March 2003, Watts completed an Immune Dysfunction Questionnaire Update and identified numerous problems he was having.[37] Watts's problems with daily living activities manifested in his need for oxygen and a motorized wheelchair.[38] Watts argues that Prudential's suggestion that a surveillance video showing him walking for a short period of time and getting into his truck should be determinative ignores the reality of his condition. Watts argues that he is receiving IVIG infusion therapy for his disease on a weekly basis, and it is equally plausible that he was having a good day on August 26, 2004. In

---

[36] Pru-Watts 0482-0485.

[37] Pru-Watts 0647.

[38] Pru-Watts 1168.

addition, "transferring" is only one of the six listed daily activities, and walking up to a truck, getting in and securing the safety belt is only one of the many transferring activities mentioned by the Plan. Watts argues that Prudential ignored the fact that Watts was prescribed a motorized wheelchair which was deemed medically necessary by UniCare. Watts asks if, under Prudential's theory, he would have to be a bedridden quadriplegic to qualify?

Prudential noted that Watts was able to remain at home alone at times. They based this assumption on the fact that Watts's wife works. There is no evidence that Watts was alone at home. Prudential then bootstrapped to reason that if Watts was home alone, he must be capable of doing all activities of daily living. Watts and his wife both stated that he needed assistance with dressing and bathing. Watts states that he has an extremely sedentary lifestyle which includes sitting on the couch, watching TV and sleeping.[39]

Watts submits that he has a severe cognitive impairment which requires "substantial supervision." As previously noted, the Plan defines a "cognitive impairment " as a loss or deterioration in intellectual capacity that is:

- comparable to and includes Alzheimer's Disease and similar forms of irreversible dementia;
- measured by clinical evidence and standardized tests that reliably measure impairment in the individual's short-term or long-term memory, orientation as tp person, place or time; and deductive or abstract reasoning.

"Substantial Supervision" is defined in the policy as "continual oversight that may include cuing by verbal prompting, gestures, or other demonstrations by another person, and which is necessary to protect you from threats to your health or safety."

Watts argues that *Black's Law Dictionary* does not specifically define the word "continual."

---

[39] Pru-Watts 319, 0028.

It does refer to the word "continual" in the definition of "continual claim," for example, when it refers to a claim as continual it is "because it [claims] had to be reviewed annually." *Black's Law Dictionary* 8th Ed (2004). *Black's Law Dictionary* also defines a continual injury as "an injury that occurs at repeated intervals." Watts argues that under these two common uses of the word "continual," one can see that "continual oversight" means oversight at repeated intervals, not oversight that is continuing. *Black's Law Dictionary* defines "continuing" as "uninterrupted." The plaintiff argues that Prudential has incorrectly substituted "continuing and/or continuous oversight" for "continual oversight." Watts argues that it is clear that he suffers from a cognitive impairment which requires continual oversight at certain intervals. There is no requirement that he receive 24-hour care.

In reviewing a plan administrator's interpretation of an ERISA plan this court must first determine whether the terms of the plan document are ambiguous. *See generally In re Unisys Corp. Long-Term Disability Plan ERISA Litig.*, 97 F.3d at 715-16. If the terms are unambiguous, then any actions taken by the plan administrator inconsistent with the terms of the document are arbitrary. But actions reasonably consistent with unambiguous plan language are not arbitrary. If the reviewing court determines the terms of a plan document are ambiguous, it must take the additional step and analyze whether the plan administrator's interpretation of the document is reasonable. *Spacek v. Maritime Ass'n ILA Pension Plan*, 134 F.3d 283, 292 (5th Cir.1998); Bill Gray Enterprises, Inc. Employee Health and Welfare Plan v. Gourley 248 F.3d 206, *218 (C.A.3 (Pa.), 2001).

The instant Policy is ambiguous both in the use of the term "substantial assistance" and "continual." Prudential, interpretation of the policy is not reasonable. Prudential's implied definition of "substantial assistance" as requiring 24-hour care and "continual" as "continuous" are

15

not reasonable interpretations. Ambiguities must be construed against Prudential. Accordingly, based upon the substantial amount of medical evidence supporting the plaintiff's claim in the administrative record and based upon the language of Prudential's own policy, the court finds that Prudential was arbitrary and capricious in denying catastrophic LTD benefit. Prudential's Motion for Summary Judgment will be denied and the plaintiff's Motion for Summary Judgment will be granted.

In an ERISA action by a plan participant, the court may, in its discretion, allow reasonable attorney's fees and costs of the action to either party. 29 U.S.C. §1132(g). The plaintiff's attorney in this matter has requested and is entitled to fees and costs. Mr. Matt will be required to submit a detailed accounting of costs and of his time and his customary hourly wages before the court will determine the amount of fees.

Lake Charles, Louisiana, this 22 day of August, 2005.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE